UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-81549-CIV-MARRA/JOHNSON

NANTUCKET ENTERPRISES, INC.,

Plaintiff,

vs.

THE CITY OF PALM BEACH GARDENS,

Defendant.
_______________________________________/

**ORDER**

This cause is before the Court upon Defendant's Motion to Dismiss Plaintiff's Third Amended Complaint With Prejudice (DE 119). The motion is briefed and ripe for review. The Court has carefully reviewed the briefs and is otherwise fully advised in the premises.

**I. Background**[1]

In 1992, Plaintiff Nantucket Enterprises, Inc. ("Plaintiff") secured a lease to operate a restaurant and nightclub in a hotel, retail, and office complex in Palm Beach Gardens, Florida. (DE 115 ¶ 2) ("Third Amended Complaint" or "Complaint"). Plaintiff leased the premises from 1992 to 2008. (Third Amended Complaint ¶¶ 2, 27, 33). "The premises are either formerly or presently owned or controlled by John D. MacArthur or one or more of the business entities he was affiliated with, including the presently existing John D. and Catherine T. MacArthur Foundation." (Third Amended Complaint ¶ 5).

[1] The Court accepts all of Plaintiff's allegations as true in determining whether it has stated a claim for which relief can be granted. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Plaintiff alleges that the Defendant City of Palm Beach Gardens ("the City") has an unofficial custom or practice of allowing certain properties—including properties owned or formerly owned by John D. MacArthur or one or more of the businesses with which he was affiliated or controlled—to be developed, constructed, or maintained outside of the normal building procedures, statutes, rules, and regulations with which other properties must comply. (Third Amended Complaint ¶ 20(a)).[2] One such property, according to Plaintiff, is the property on which its leased premises is located. Plaintiff alleges that the property "has never received final building approvals or a certificate of occupancy," but "the City issued a red tag to [Plaintiff] and temporarily closed [its] business operations because [Plaintiff] was unable to timely obtain necessary building permits or a certificate of occupancy, in large part due to the improper development the City allowed through the [property on which the leased premises is located.]" (Third Amended Complaint ¶ 20(c)).[3] This improper development included the City's allowing development "without sufficient proof of ownership, without sufficient survey and legal descriptions, without proper environmental reports and analysis, without timely completion (to this date) of development conditions and obligations, without final

[2] For example, "the City allowed development and construction of the following properties outside of the proper strictures of applicable statutes, rules, codes and procedures": Tanglewood, which was allowed to be improperly subdivided and built without proper planning, permitting, and final approval in the mid-1970's; the Weiss School, which was allowed to make renovations much more substantial than Plaintiff's renovations (and the City did not require a new certificate of occupancy, it only required a certificate of completion in 2009); 4440 PGA Blvd, which was built without proper planning, permitting, final approval, and any certificate of occupancy in 1976; 4350 PGA Blvd., which was built without proper planning, permitting, final approval, and any certificate of occupancy from 1988 to present (and which has undergone renovations much more substantial than Plaintiff's renovations, and the City did not require a new certificate of occupancy); Golfer's Village; JDM Country Club; PGA National Golf Club Estates; [t]he Former Holiday Inn on PGA Blvd, which was built without proper planning, permitting, final approval, and any certificate of occupancy in the early 1970's; Burns Road Public Storage; and the former Sermatec Building on Burns Road." (Third Amended Complaint ¶ 20(b), (e)).

[3] Notwithstanding this Court's admonishment in a previous order that Plaintiff's complaint "does not explain what a 'red tag' is, nor does it explain the City's purported reason for placing the 'red tags,'" (DE 31 at 2 n.2), Plaintiff's Third Amended Complaint still fails to clarify both *what* "red tags" are and *why* the City places them.

development approval and sign off and without a certificate of occupancy." *Id.* And because of this allegedly improper development, Plaintiff concludes, "[it] was unable to timely complete its own renovations to the Leased Premises. For example, due to the absence of as-builts for [the property on which Plaintiff's leased premises is located], [Plaintiff] was materially delayed in securing permits and licensing from regulatory agencies. For the same reasons, [Plaintiff] never could have obtained the certificate of occupancy because there is no certificate of occupancy on the underlying properties . . . ." *Id.*

Plaintiff further alleges that this unofficial custom or practice was enforced through the City's final policymakers: Doug Wise ("the head building official"); Ron Ferris (the City Manager); and the City Council.[4] "The City Manager has ultimate decisionmaking on approving or denying Certificates of Occupancy." (Third Amended Complaint ¶ 17). "The City Council is charged with final decisionmaking on allowing development within the City, approving Planned Unit Developments . . ., approving construction through permits and ordinances, [and] approving subdivision of properties (commercial and residential)." (Third Amended Complaint ¶¶ 18, 22). "Ron Ferris and the City Council are policy makers of the City because they are responsible for decisions affecting development and building within the City, they are responsible for the decisions to enforce or not to enforcement [sic] of laws, codes and the regulations of the State, County and City within the City [sic] and they are responsible for the health, safety and welfare of those living, working, visiting or schooling within the City." (Third Amended Complaint ¶¶ 19, 22).

---

[4] This unofficial custom or practice is allegedly permanent and well-settled because it has been in place from the early 1970's to at least 2009. (Third Amended Complaint ¶ 23).

It is Plaintiff's position that "[w]hile the City allows development and construction on certain properties[,] it arbitrarily enforces its codes and regulations upon others and unlawfully enforces same through red tags, including the issuance of red tags upon [Plaintiff,] Robert H. Donelian, Palm Beach Community Church, and the Borland Center/Midtown." (Third Amended Complaint ¶ 20(d)). The reasons for this disparate enforcement, according to Plaintiff, are "favoritism and to cover up environmental contamination caused by allowing industrial waste to be dumped by properties and utilities" that John D. MacArthur or one of his entities owned or operated. (Third Amended Complaint ¶¶ 20(a), 24). Plaintiff alleges that the City's "policy" is meant to "cover up the fact that for decades the water, sewer lines and/or ground at the [p]roperty and surrounding areas has been contaminated," that the City was operating a water plant and waste water treatment plant to the northwest of the property "without any proper licensing or permitting for a decade or more," and that the City let other industries dump industrial waste into the water plant and waste water treatment plant. (Third Amended Complaint ¶¶ 25–26, 32). Plaintiff further alleges that Ron Ferris and the City Council knew of the water and ground contamination at the property and surrounding areas and of an alleged "cover up of the lack of sewage capacity in Palm Beach Gardens, Florida . . . ." (Third Amended Complaint ¶¶ 31, 34).

In November 2008, the City sought Plaintiff's compliance with code provisions that required Plaintiff to obtain a certificate of occupancy—a certificate that, according to Plaintiff, the City could never issue because the entire complex "was constructed without proper permitting and code compliance . . . ." (Third Amended Complaint ¶¶ 27, 33, 38, 51). At some point, the City Manager allegedly approved "the armed removal of [Plaintiff] on November 12, 2008—the day [Plaintiff] was

prepared to show its entitlement to the Certificate of Occupancy through a final walk through . . . ." (Third Amended Complaint ¶¶ 27, 33, 53).

Plaintiff alleges that "[a]s part of the scheme to hide the environmental contamination, the true owners of [t]he [p]roperty were concealed and the City knew this to be another problem with [Plaintiff's] business plans. In fact, the purported owners/operators concocted an elaborate scheme to transfer the [p]roperty which included a bogus mortgage and fraudulent foreclosure action. The City was aware of these unlawful acts and allowed them to continue." (Third Amended Complaint ¶ 39). Plaintiff further alleges that "[t]he City fabricated code violations to mete out heavy handed, unnecessary, unlawful and abusive building and code enforcement tactics, and to harass and stonewall [Plaintiff] through building officials, inspectors, and police officers, specifically including the Chief Building Official at the time, Douglas Wise[,] to further the City's policy or custom." (Third Amended Complaint ¶ 40).

According to Plaintiff, "[t]he City responded favorably to the owners' solicitation to orchestrate code enforcement proceedings by [the City] for use as a distraction to [Plaintiff] and as a potential back up plan in the event the owners' planned November 4, 2008 lockout of [Plaintiff] failed." (Third Amended Complaint ¶ 41). "Further, the City initiated its own abuses by the code enforcement and building departments as a policy and a custom to extort disputed payments from [Plaintiff] to the City." (Third Amended Complaint ¶ 42).

Plaintiff alleges that the City's actions were intended to (and did) intimidate Plaintiff. (Third Amended Complaint ¶ 43). Plaintiff further alleges that "the City knowingly, oppressively and maliciously applied its policies and customs to [Plaintiff] to violate [Plaintiff's] consitutional rights and Florida Law in accepting and responding to knowingly false reports of trespass and criminal

accusations against [Plaintiff], in agreeing to force and pressure by the landlord, owners and managers that the City place a "red tag" on the doors and entrances to [Plaintiff's] restaurant and lounge and its kitchen facilities as a material participation in the efforts of the Landlords' plan to unlawfully and forcibly take [Plaintiff's] property rights and takeover its business operations." (Third Amended Complaint ¶ 47).

On November 8, 2010, Plaintiff filed a two-count complaint in state court alleging claims under 42 U.S.C. § 1983 for deprivation of civil rights and under Florida Statute § 119.07 for violation of Florida's Public Records Act. (DE 1). On December 2, 2010, the City filed a motion to dismiss and concurrently filed a notice of removal. *Id.* Instead of responding to the motion, Plaintiff sought leave to file an amended complaint (DE 15), which this Court granted (DE 16). Plaintiff filed its amended complaint on March 21, 2011 (DE 17), and the City moved to dismiss the amended complaint on March 23, 2011. (DE 22). On August 5, 2011, the Court granted the City's motion to dismiss and gave Plaintiff until August 29, 2011, to file its second amended complaint. (DE 31). After receiving four separate extensions, Plaintiff filed its second amended complaint on December 6, 2011. (DE 35). The City moved to dismiss that complaint, and the Court granted the City's motion, stating as follows:

> The Court has carefully reviewed the Second Amended Complaint ("SAC") and concludes that it again fails to state a plausible claim. The SAC is one man's version of the developmental history of the City of Palm Beach Gardens which inexplicably purports to have some causal connection to Plaintiff's eviction from a commercial leasehold. The eviction also purports to constitute some type of constitutional violation. To the extent there are some allegations that may arguably approach the articulation of the violation of some constitutional right, the allegations are wholly conclusory. The observation that the complaint does not meet the plausibility requirement for pleading a valid claim in the federal courts would be an understatement.

(DE 101). The Court further noted that "Plaintiff shall have one last opportunity to amend his complaint to allege a plausible constitutional violation."

Plaintiff's Third Amended Complaint brings seven counts against the City: violation of equal protection under 42 U.S.C. § 1983 (Count I); deprivation of substantive due process under 42 U.S.C. § 1983 (Count II); deprivation of procedural due process under 42 U.S.C. § 1983 (Count III); deprivation of the right to be free from unreasonable force and seizure of property under 42 U.S.C. § 1983 (Count IV); deprivation of the right to rewarded by industry under the Florida Constitution (Count V); public records violations under Florida Statute § 119.07 (Count VI); and mandamus to comply with public records requests (Count VII). The City moves to dismiss with prejudice Plaintiff's final complaint.

Just like Plaintiff's previous three attempts, the instant complaint is disorganized, repetitive, and implausible. But most importantly, the final amendment has failed to cure the pleading deficiencies that the Court addressed in its earlier orders. The City's motion to dismiss is accordingly granted. Plaintiff's claim shall be dismissed with prejudice.

## II. Legal Standard

Rule 8(a) of the Federal Rules of Civil Procedure "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief' in order to give the defendant fair notice of what the plaintiff's claim is . . . and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009). Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S. Ct. at 1950. When considering a motion to dismiss for failure to state a claim, the court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11th Cir. 2010) (internal quotation marks omitted).

## III. Discussion

### A. Count I: Equal Protection under 42 U.S.C. § 1983

"The Supreme Court has placed strict limitations on municipal liability under § 1983." *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). A county's liability under Section 1983 "may not be based on the doctrine of respondeat superior." *Id.* A local government is "liable under Section 1983 only for acts for which the local government is actually responsible." *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1027 (11th Cir. 2001). "Indeed, a county is liable only when the county's 'official policy' causes a constitutional violation." *Grech*, 335 F.3d

at 1329. Thus, Plaintiff must "'identify a municipal 'policy' or 'custom' that causes [its] injury.'" *Id.* (quoting *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)).

A § 1983 plaintiff "has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Id.* "Because a county rarely will have an officially-adopted policy of permitting a particular constitutional violation, most plaintiffs . . . must show that the county has a custom or practice of permitting it and that the county's custom or practice is 'the moving force [behind] the constitutional violation.'" *Id.* at 1330 (quoting *City of Canton*, 489 U.S. at 389).

To establish "§ 1983 liability against a municipality based on custom, a plaintiff must establish a widespread practice that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.'" *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)); *see also Wayne v. Jarvis*, 197 F.3d 1098, 1105 (11th Cir. 1999) ("To establish a policy or custom, it is generally necessary to show a persistent and widespread practice.").

Additionally, to allege municipal liability under Section 1983, "a plaintiff (1) must show that the local governmental entity, here the [City], has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue." *Grech*, 335 F.3d at 1330.

Here, Plaintiff does not attempt to allege that the City's course of conduct towards it was an official policy, and its attempt to allege the existence of "an unofficial custom or practice" fails. In response to Plaintiff's first attempt to make the "unofficial custom or practice" allegation, this Court held:

> While Plaintiff alleges several instances of allegedly antagonistic conduct towards [its] Restaurant—such as harassing building inspections, harassment from off-duty policy officers hired by the landlords, and evicting Plaintiff from the premises—this conduct was limited to the restaurant alone. The alleged custom did not affect anyone else. This was not a "widespread" or "pervasive" practice, but instead a "single incidence." Accordingly, the alleged conduct towards Plaintiff is insufficient to constitute a custom for Section 1983 liability.
>
> Additionally, the only officials specifically identified as being involved in the alleged harassment towards Plaintiff are Sergeant Jack Schnur and Mr. Wise, the head building official. Plaintiff does not allege that either individual was a "final policymaker for the [City]," and as such Plaintiff has failed to sufficiently allege a Section 1983 claim based on these officials' alleged conduct.
>
> Thus, because Plaintiff has failed to allege sufficiently an official policy, an unofficial custom, or a final policymaker that caused the alleged constitutional violations, Plaintiff's Section 1983 claim against the City fails. However, because this ruling is based on a pleading deficiency, the Court will permit Plaintiff leave to amend the complaint to attempt to cure these defects. Specifically, Plaintiff should allege whether the City's antagonism towards nightclubs on PGA Boulevard is an official policy, stemming from a policy statement, ordinance, regulation, or final policymaker, or whether it is an unofficial custom. If the latter, Plaintiff should allege whether other nightclubs, or any other entity, suffered similar harassment under the alleged custom. Plaintiff should also allege who or what entity set forth the alleged policy or custom. That is, Plaintiff should identify the officials or entities responsible for the alleged policy or custom and allege facts supporting the conclusion that those officials or entities are final policymakers.

(DE 31 at 7–9) (citations omitted). In an attempt to heed the Court's advice, Plaintiff now alleges that the City's unofficial custom or practice allows certain properties, *see supra* note 2, to be developed, constructed, or maintained outside of the normal building procedures, statutes, rules, and regulations with which other properties (such as the property on which Plaintiff's leased premises is located) must comply. (Third Amended Complaint ¶ 20(a)). And Plaintiff further alleges that this

unofficial custom or practice was enforced through the City's final policymakers, which include the head building official, the City Manager, and the City Council.

The problem with Plaintiff's allegations is that, even if taken as true, they fail to establish that the City unequally applied a facially neutral ordinance for the purpose of discriminating. To prevail on the type of equal protection claim Plaintiff has brought, "basically a selective enforcement claim," Plaintiff must show that (1) it was treated differently from other similarly situated entities, and (2) the City unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiff. *See Campbell v. Rainbow City*, 434 F. 3d 1306, 1314 (11th Cir. 2006) (citing *Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996)).

At bottom, taking Plaintiff's allegations as true, Plaintiff has failed to establish the existence of a conspiracy or how the alleged conspiracy motivated the City to allegedly violate Plaintiff's constitutional rights in a discriminatory way. As the City correctly points out:

> Plaintiff essentially alleges that the City, along with the owner ("true owner/"fake" owner, it is not clear), engaged in an ultimately successful scheme of getting the Plaintiff out of the building and out of its lease. Other than conclusory [allegations] that some of these actions were motivated by the City's desire to further the City's policy or custom there are no factual allegations that would make this plausible. Indeed, if the City and the owners/landlord were scheming to get [Plaintiff's] restaurant out of the building how would this further the alleged custom of conspiracy? Indeed, why would the "conspirators" lease to the Plaintiff in the first place if only to have to force them out later, or alternatively why would the "conspirators" not just continue with their "scheme" of not requiring proper permitting in the "conspirators'" buildings and let the Plaintiff expand without any permitting so as to not shed light on the "conspiracy" and hidden "scheme of covering up environmental contamination?"

(DE 119 at 7). The City raises a number of valid questions, and Plaintiff has failed to address any of them (either through the instant complaint or through Plaintiff's response to the City's motion to dismiss).

The Third Amended Complaint contains no factual allegations that would make it plausible that the City conspired with anyone to arbitrarily enforce its code, cover up environmental contaminations, or both. But even assuming the existence of Plaintiff's alleged conspiracy, Plaintiff has failed to allege any facts that, taken as true, would make it plausible that the conspiracy was the moving force behind the constitutional deprivations Plaintiff allegedly suffered.

**B. Count II: Substantive Due Process under 42 U.S.C. § 1983**

Plaintiff's second count is virtually identical to its first: it merely removes the paragraph dealing with the differing treatment of similarly situated persons. The crux of Plaintiff's claim is that its right to substantive due process was violated when the City required Plaintiff to obtain a certificate of occupancy, when it "red tagged" a portion of Plaintiff's property for not obtaining a certificate of occupancy, and when it forced Plaintiff "out of the entirety of the Leased Premises without a court order at the request of the purported owners and landlords of the Property." (Third Amended Complaint ¶ 84).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." *See Doe ex rel. Doe v. City of Opa-Locka*, No. 11-21975-CIV, 2013 WL 1176239 (S.D. Fla. Mar. 20, 2013). "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Albright v. Oliver*, 510 U.S. 266, 271–72 (1994) (plurality). Notably "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Id.* at 272 (citing Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 847–49 (1992)).

Plaintiff has presented the Court no valid reason or authority that supports expanding the concept of substantive due process to a situation involving a corporate entity's eviction from a commercial leasehold, and the Court sees no reason to do so here. Count II of Plaintiff's complaint shall accordingly be dismissed.

**C. Count III: Procedural Due Process under 42 U.S.C. § 1983**

Plaintiff alleges that it has a constitutionally protected property right in its lease and its business operations under the lease, and that the City's conduct deprived Plaintiff of its right when it required Plaintiff to obtain a certificate of occupancy that was not required and when it forced Plaintiff out of the leased premises without a court order at the request of the purported owners and landlords of the property. (Third Amended Complaint ¶ 90). Plaintiff further alleges that it had a hearing scheduled by the City due to its alleged failure to comply with the certificate of occupancy issues, but "the City deprived [Plaintiff] of these due process rights when it red tagged portions of the [p]roperty, stopped the final inspection process on November 12, 2008 without basis and for improper purposes and then when it forced [Plaintiff] and its agents out of the Leased Premises without any court order or legal process and prior to the hearing." (Third Amended Complaint ¶ 93).

"It is axiomatic that, in general, the Constitution requires that the state provide fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property." *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994). "[A] procedural due process violation is not complete," however, "unless and until the State fails to provide due process. In other words, the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *Id.* at 1557 (citing *Zinermon v. Burch*,

494 U.S. 113, 123 (1990)); *see also id.* at 1560 ("When a state procedure is inadequate, no procedural due process right has been violated unless and until the state fails to remedy that inadequacy.").

Thus, "[a]ll that due process requires . . . is a post-deprivation 'means of redress for property deprivation satisfying the requirements of procedural due process." *Id.* at 1563 (citing *Paratt v. Taylor*, 451 U.S. 527, 537 (1981)). Here, even assuming Plaintiff suffered a procedural deprivation at the hands of the City, "[it] has not suffered a *violation* of [its] procedural due process rights unless and until the State of Florida refuses to make available a means to remedy the deprivation." Plaintiff has failed to allege that Florida has refused to make available a means to remedy his deprivation, and its claim of a violation of procedural due process necessarily fails as a matter of law.

**D. Count IV: Unreasonable Force and Seizure of Property under 42 U.S.C. § 1983**

Plaintiff alleges that, even as a corporate entity, it has the right to be free from unreasonable force and seizure of its property. To that end, Plaintiff alleges that the City's actions deprived it of that right when the City required Plaintiff to obtain a certificate of occupancy that was not required, when it red tagged Plaintiff's restaurant, lounge, and kitchen for not obtaining a certificate of occupancy, and when it forced Plaintiff "out of the entirety of the leased premises without a court order at the request of the purported owners and landlords of the [p]roperty." (Third Amended Complaint ¶ 97). Plaintiff further alleges that "[t]he actions of the City were more than necessary and involved excessive force through the threat of arrest through armed police officers forcing Plaintiff and its agents out of the Leased Premises without court order." (Third Amended Complaint ¶ 98).

Plaintiff provides no support for its proposition that a corporate entity may bring a § 1983 claim for unreasonable force and seizure of property; and the Court concludes that, as a matter of

law, no such claim has been sufficiently alleged here. Plaintiff's claim of unreasonable force and seizure of property shall accordingly be dismissed.

**E. Counts V, VI & VII: Remaining State Law Claims**

Having dismissed the federal law claims in this action, and finding no diversity of jurisdiction over the parties, the state law claims (Counts V, VI & VII) against the City can only be maintained through the Court's exercise of supplemental jurisdiction. *See Moore v. Miami-Dade Cnty.*, No. 06-22705-CIV, 2007 WL 4644629, at *6 (S.D. Fla. Dec. 10, 2007) (citing 28 U.S.C. § 1367(c)(3)). The Court declines to exercise supplemental jurisdiction over these state law claims.

## IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to Dismiss Plaintiff's Third Amended Complaint With Prejudice (DE 119) is **GRANTED.** Counts I, II, III & IV of Plaintiff's Third Amended Complaint are **DISMISSED WITH PREJUDICE.** The Court declines to exercise supplemental jurisdiction over the remaining state law counts, so those counts (V, VI & VII) are **DISMISSED WITHOUT PREJUDICE.** Judgment shall be entered separately.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 29th day of July, 2013.

KENNETH A. MARRA
United States District Judge